# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| RAYMOND FABER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-00045 |
| | ) | |
| MOUNTAIN STATES | ) | Judge James P. Jones |
| PHYSICIAN GROUP, INC., and | ) | Magistrate Judge Pamela Meade |
| BALLAD HEALTH | ) | Sargent |
| | ) | |
| Defendants. | ) | ORAL ARGUMENT REQUESTED |

## UNDISPUTED FACTS ADMITTED BY PLAINTIFF

### On Billing

1. Dr. Faber did not complain about billing issues or how claims were being billed. *See* Doc. 22-5 at ¶ 6; Doc. 22-8 at ¶ 8.

2. Dr. Faber did not have responsibility for and was not involved in billing insurance companies or patients for services provided. Doc. 22-1 at 52:15–19; 113:13–16.

3. Dr. Faber did not review bills, discuss billing with anyone, or have knowledge about how patients were billed for services or whether they were billed at all. Doc. 22-1 at 113:13–16; 116:3–117:4; 121:16–122:24.

4. Dr. Faber's lawsuit is not about the bills that go to Medicare; it is about the interactions that happened around whether or not a patient should be admitted, not the end product that goes to any billing service or payor. Doc. 22-1 at 116:12–117:4 ("I think that's a lot more accurate way of saying it," that the "complaints are about the interactions that happened around whether or not a patient should be admitted, not the . . . end product that goes to any billing service or payor").

5. Dr. Faber's complained-of interactions are about whether patients should be admitted or sent home. *Id*. at 116:12–117:4; Dye Decl. ¶ 8.

6. Before he was terminated, Dr. Faber stated that his concerns about the ED were based on patient safety, not improper billing or coding. *See* Doc. 22-2 at ¶ 15 (Dr. Faber stating that he did not "feel either Dr. Dye or Odeti are as concerned as our hospitalist team about patient safety," and that he has "been censured about [his] concerns for patient safety").

**On Dr. Faber's Job Performance**

7. Dr. Faber had a longstanding pattern of disruptive behavior and disrespectful treatment of his colleagues. *See* Doc. 22-8 at ¶¶ 5–7; Doc. 22-7 at ¶ 4.

8. There were many more disagreements between ED doctors and Dr. Faber than with other hospitalists. *See* Doc. 22-4 at ¶ 8; Doc. 22-7 at ¶ 4.

9. At least five doctors and two physician's assistants believed Dr. Faber pushed for discharge of patients when they felt it was unsafe to do so. Doc. 22-4 at ¶ 12.

10. On nights that Dr. Faber worked, it could be difficult to manage ED patient flow due to the number of disagreements between him and other providers. Doc. 22-4 at ¶ 8; Doc. 22-7 at ¶ 4; Doc. 22-8 at ¶ 7.

11. Multiple ED physicians did not want to work on the same shift as Dr. Faber, which made it harder to staff the ED. Doc. 22-4 at ¶ 14; Doc. 22-5 at ¶ 8.

12. Some physicians said they were never coming back to JMH because it was difficult to take care of patients as long as Dr. Faber was working there. Doc. 22-4 at ¶ 14; Doc. 22-5 at ¶ 8.

13. Dr. Faber sent racially charged emails about a colleague's accent. Doc. 22-2 at ¶¶ 15–16.

14. In his January 7 email to his church, Dr. Faber complained about a "Hindu mid-level manager who . . . follows more of an Art of War style . . . our adversary is not people." This racially charged, bigoted language was of great concern to JMH and MSPG. *See* Doc. 22-2 at 10; Doc 22-9 at ¶ 8.

15. In that same email, Dr. Faber suggested that the Abingdon community could not "trust [JMH's] services." *See* Doc. 22-2 at 10.

16. This, too, was extremely concerning to JMH and MSPG. *See* Doc. No. 22-9 at ¶ 8.

17. Dr. Faber was combative with patients and was dismissive, condescending and unkind toward them. Doc. 22-6 at ¶ 13.

18. JMH received patient complaints that Dr. Faber was unprofessional and argumentative with the patient's family and made the patient feel that he "did not want to help [her]." Doc. 22-2 at ¶ 17.

19. JMH received patient complaints that Dr. Faber spoke condescendingly to a patient's family and undermined the ED providers in front of patients. Doc. 22-2 at ¶ 18.

20. Though multiple colleagues attempted to mentor Dr. Faber and speak to him about his issues interacting with colleagues, his behavior did not change. Doc. 22-2 at ¶ 12.

**On Dr. Faber's Termination**

21. On December 23, 2019, Nick Branham requested that Patty Turner draft a termination letter for Dr. Faber. Doc. 22-2 at ¶ 28.

22. Though Nick Branham had determined to terminate Dr. Faber's employment by December 2019, he waited to terminate him, hoping he could another hospitalist to cover night shifts first. *See* Doc. 22-2 at ¶ 7.

23. MSPG and JMH were greatly concerned that Dr. Faber's email to his church listserv because he made bigoted statements about a Hindu colleague, and because he falsely suggested that the community could not trust the care at JMH. *See* Doc. 22-9 at ¶ 8.

24. Dr. Peters had no advance knowledge of MSPG's plan to terminate Dr. Faber in December, or any knowledge of the termination before it occurred. Doc. 22-7 at ¶ 9.