# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **RAYMOND FABER,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20CV00045 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **MOUNTAIN STATES PHYSICIAN** | ) | JUDGE JAMES P. JONES |
| **GROUP, ET AL.,** | ) | |
| | ) | |
| Defendants. | ) | |

*Steven R. Minor, ELLIOTT LAWSON & MINOR, Bristol, Virginia, for Plaintiff; Brian Roark and Allison Wiseman Acker, BASS BERRY & SIMS PLC, Nashville, Tennessee, for Defendants.*

In this civil case, a physician has alleged that the physician group for which he worked and its ultimate parent corporation unlawfully retaliated against him because he engaged in protected activity under the federal False Claims Act. He has also asserted a related state-law claim of wrongful discharge in violation of Va. Code Ann. § 32.1-125.4 (2018). Following discovery, the defendants have moved for summary judgment. I find that the undisputed facts show that the defendants are entitled to judgment as a matter of law. I will therefore grant the defendants' Motion for Summary Judgment.

I.

The following facts are taken from the summary judgment record and are undisputed except where indicated.

The plaintiff, Raymond Faber, M.D., was employed as a hospitalist by defendant Mountain States Physician Group, Inc. ("MSPG"), and worked as a nocturnist[1] at Johnston Memorial Hospital ("JMH") from 2017 until he was terminated on January 12, 2020.  Defendant Ballad Health ("Ballad") manages operations at JMH and 20 other hospitals in the region.  Ballad is the parent company of Mountain States Health Alliance ("MSHA"), which is the majority owner of JMH.  MSHA is also the parent company of Blue Ridge Medical Management Corporation, of which MSPG is a subsidiary.  MSPG employs physicians who staff hospitals in northeast Tennessee and southwest Virginia.

Patients who arrive at JMH's Emergency Department ("ED") are seen by an ED physician.  The ED doctor may treat and discharge the patient, recommend that they be kept in the hospital for further observation, or recommend that they be admitted as an inpatient.  ED physicians at JMH do not have admitting privileges.  If an ED physician believes a patient should be admitted, the ED physician refers the patient to the hospitalist physician who is working at the time.  If the hospitalist agrees with the ED physician's assessment, the hospitalist admits the patient.  If the

---

[1]  A nocturnist is a hospitalist who works the overnight shift.

hospitalist disagrees, the two physicians discuss the situation and attempt to determine whether the patient should be admitted or discharged.

Sometimes the ED physician believes it would be unsafe to send the patient home, but the hospitalist believes the patient does not meet admission criteria. While these disagreements can be difficult, the hospitalist is ultimately responsible for deciding whether to admit the patient. The hospitalist admits patients under his provider number and must sign off on the admission on the patient's chart.

Dr. Faber often disagreed with ED doctors about whether patients should be admitted. Inpatient admissions are costly, and the federal Medicare program will pay for them only if they are deemed medically necessary. 42 U.S.C. § 1395y(a) ("[N]o payment may be made . . . for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]").

The ED doctors at JMH are employed by an independent staffing company called Schumacher Clinical Partners ("SCP"). Prior to April 1, 2018, the ED was staffed by Valley Emergency Physicians ("VEP"). MSPG, VEP, and SCP are unrelated entities.

Dr. Faber's employment was governed by a Hospitalist Employment Agreement between himself and MSPG dated March 16, 2018 ("Employment Agreement").[2] Section 5.3 of the Employment Agreement states:

> **Termination without Cause.**  Despite any conflicting provisions in this Agreement, either you or we may terminate this Agreement without cause by providing at least 90 days (the "Required Notice") prior written notice to the other party.

Defs.' Mem. Supp. Ex. 2, Kindle Decl. Ex. B at 5, ECF No. 22-2.  Section 5.4 states:

> **Liquidated Damages.**
>
> 5.4.1  If you terminate this Agreement due to our breach under Section 5.2.2, or we terminate this Agreement without cause under Section 5.3 but give you less than the Required Notice, we will pay you liquidated damages equal to the Liquidated Amount.

*Id.*

Dr. Faber's supervisor was MSPG's Assistant Vice President Nick Branham. At the time of Dr. Faber's termination, the President of MSPG was Mark Patterson, M.D.  Mhroos Peters, M.D., was JMH's Chief Medical Officer, and Matthew Dye, D.O., was Chief of the ED.  John Jeter was CEO of JMH.

Dr. Faber was not involved in billing insurance companies for services provided to patients.  He did not review bills or discuss billing with anyone.  He did not know how patients or insurers were billed or whether they were billed for particular services.  He did not know which patients were Medicare enrollees.  He

---

[2] The record contains no suggestion that Dr. Faber had a separate contract with Ballad or JMH.

did, however, know that a substantial number of patients treated at JMH were Medicare enrollees, and he knew that billing was done based on the codes doctors listed for the diagnoses they made and the services they performed.

In his deposition, Dr. Faber was asked the following question and gave the following response:

> Q.   Okay.  So your complaints in your lawsuit, I understand that you don't know what happened with the billing and coding.  So your complaints are about the interactions that happened around whether or not a patient should be admitted, not the kind of end product that goes to any billing service or payor, is that correct?

> A.   I think that's a lot more accurate way of saying it, and some of those complaints were that ER actually tried to tell us to call it this when the history, physical, family complaints were clearly not that.

> I don't think any physician can say we're -- that's a full-time department, the billing and coding people.  What goes on after that, the bills, the 130 insurance companies they send it out to, is a very complicated thing that is why I'm glad I'm not a billing and coding person by primary profession.

*Id*. at Ex. 1, Faber Dep. 116-17, ECF No. 22-1.

While working at JMH, Dr. Faber sometimes insisted on discharging patients who the ED doctors thought needed to be admitted.  Dr. Faber disagreed with ED doctors significantly more often than other hospitalists at JMH.  These frequent disagreements and the interactions surrounding them led to counseling sessions with Dr. Faber.  Dr. Faber eventually began contending that admitting certain patients would amount to Medicare fraud or a violation of Ballad's Code of Ethics.

On July 25, 2019, Dr. Faber sent an email to Shyam Odeti, M.D., the head of the hospitalist group, referencing a "discussion about ED complaints from the last week." Kindle Decl. Ex. P at 1, ECF No. 22-2. In the email, Dr. Faber wrote:

> I am painfully obligated to ensure the minimum:  1) We aren't misrepresenting the admission and become liable for Medicare fraud; 2) We are capable of safely handling the admission; 3) We are admitting when admission is guideline-indicated -- preventing countless downstream waste of healthcare dollars, needless community expenditure in a relatively poor Appalachian community, and long-term drop in patient satisfaction.

*Id.* at 1-2. Four days later, Dr. Faber wrote in an email to Dr. Dye, "When it comes to admission discussions, I must minimally ensure . . . [w]e are not committing medicare fraud by what we call admissions[.]" Kindle Decl. Ex. Q at 2, ECF No. 22-2. In the same email, he complained about another hospitalist who allegedly had attempted to admit a dead patient.  Dr. Faber then wrote, "I've been told by experienced ED providers that the real reason they are admitting is that:  'I like my house' -- and would rather I commit a federal crime and mis-label the reason for admission." *Id.*

On December 17, 2019, Dr. Faber secretly recorded a meeting with Branham, Dr. Odeti, and Dr. Peters.  In the meeting, he discussed the issue of ensuring "[w]e aren't misrepresenting the admission and become liable for Medicare fraud." Kindle Decl. Ex. V at 1, ECF No. 22-2.  Despite these concerns, Dr. Faber never complained

to Ballad's compliance department.  He never admitted a patient who he believed did not meet admission criteria.

Dr. Faber's conflicts with his colleagues were problematic.  He often treated other providers disrespectfully.   According to Dr. Dye, Dr. Faber's frequent disagreements and lengthy discussions created patient flow problems and wasted time.  Dr. Faber was sometimes unprofessional and emotionally charged.  He seemed to have more conflicts with nurse practitioners, physician's assistants, less experienced physicians, and women physicians.

Several ED physicians complained to Dr. Dye and others about Dr. Faber's insistence on discharging patients who the ED providers did not feel comfortable discharging.  Dr. Dye asked ED doctors for examples of such cases, and at least five doctors and two physician's assistants submitted examples.  Dr. Faber became very angry when presented with these cases.

Dr. Faber often disagreed with Elena Magrans, M.D., an ED physician.  On one occasion, he refused to admit a patient who had undergone surgery that day and presented to the ED not oriented to his situation.  After spending nearly an hour trying unsuccessfully to convince Dr. Faber to admit the patient, Dr. Magrans had the patient transferred to another nearby hospital for admission.  In response, Dr. Faber threatened to report Dr. Magrans to hospital administration.

Some ED physicians did not want to work on the same shift as Dr. Faber, and some said they would never return to JMH because Dr. Faber's behavior made it too hard to care for patients.  This created difficulty in securing adequate staffing for the ED.  Several of Dr. Faber's colleagues and superiors attempted to discuss these issues with him and mentor him, but his behavior remained the same.  Dr. Faber was also at times dismissive, combative, and condescending toward patients and their family members, which led to complaints.  Sometimes he refused to go to the ED to see a patient who the ED doctor had asked him to admit.  According to Jeter, "To refuse to go see a patient was not acceptable — this was the job of a hospitalist." *Id.* at Ex. 6, Jeter Decl. ¶ 10, ECF No. 22-6.

Jeter believed that when Dr. Faber raised the issue of Medicare fraud, he "was not actually discussing Medicare fraud, but was attempting to win the argument he had begun or intimidate the other provider." *Id.* ¶ 12.  In addition to conflicts regarding patient admissions, Dr. Faber also complained to various colleagues about nurse staffing, nurse practitioner contract negotiations, the residency program, and other matters that were outside the scope of his duties, sometimes asserting that JMH was violating regulations or creating legal issues.  He repeatedly alleged that the other nocturnist at JMH had tried to admit a dead patient although an investigation revealed that to be untrue.  He criticized colleagues in ways that some viewed as racially charged or based on national origin or religion.  He inadequately supervised

medical residents and assigned multiple admissions to residents within minutes of each other, which created patient safety concerns.

On December 17, 2019, Branham, Dr. Odeti, and Dr. Peters met with Dr. Faber to discuss his unprofessional behavior. They explained that his behavior was putting his job at risk. When his conduct did not change following this meeting, on December 23, 2019, Branham asked Patty Turner to draft a letter terminating Dr. Faber. Branham did not immediately terminate Dr. Faber because he hoped to find a replacement nocturnist first. There was only one other nocturnist at JMH and Dr. Faber's scheduled shifts would need coverage following his discharge.

Dr. Peters met with Dr. Faber on December 31, 2019. Dr. Faber secretly recorded this meeting, although the recording has not been filed with the court. Dr. Faber declares that Dr. Peters told him:

> "Be almost invisible. I want you to be a nocturnist, full stop. I want you to get the phone calls and do the admissions. Don't be an insurance person, don't be a legal person, don't be an obstructionist, just be a nocturnist who does a good job with the patients, full stop, and that's it."

Resp. Opp'n Ex. 4, Faber Decl. ¶ 7, ECF No. 25-4.

On January 6, Dr. Faber emailed Branham about this meeting, telling him that Dr. Peters "re-affirmed what he had said to Afton and I before: essentially asking us to commit what I understand to be Medicare fraud admitting against medical

necessity." *Id*. at Ex. 7, ECF No. 25-7.  Dr. Faber asked to meet with Branham, but no such meeting occurred before his termination.

On January 7, 2020, Dr. Faber sent an email to his church's listserv asking for prayers.  The email read, in part:

> For months now our hospital group at JMH has been in significant upheaval with a Hindu mid-level manager who does not honor truth and follows more of an Art of War style -- alternately attacking various of our physicians and providers.  The result is that possibly half of the inpatient provider team is contemplating leaving or has left.  I have also been under heat for seeking to do appropriate admissions in a way that the community will trust our services, and I would not be committing fraud in my admissions.  I also have finally spoken on behalf of our provider team -- and am now under threats to my job and numerous malicious and false accusations.

> God knows all the details of this.  He is not worried.  He hasn't needed to un-seat Himself from the Throne -- so as to pace the floor in the Holy of Holies.  He hasn't needed to go to his medicine-drawer for nerve tablets, or to wring His hands in concern.  He has been bringing us to a deep love of the Psalms -- often needing to listen to them as we lie down and when we get up in the night.

> As I head into another week of 7pm-7am shifts, I would simply ask for your prayers to the King of kings and Lord of lords -- that He would vindicate truth, provide peace and joy for us in seeking His face in our struggles, and would His will be done on earth as it is in Heaven.

> Thank you all.  We are in a spiritual struggle, and our adversary is not people (Eph 6).

Kindle Decl. Ex. A at 2, ECF No. 22-2.  The email was forwarded by a church member to her daughter, a Ballad employee, and was eventually sent to Jeter and Dr. Patterson.

-10-

To MSPG and Ballad, this email was the last straw.  They viewed it as racially charged and attempting to undercut the community's trust in JMH.  Branham asked Turner to change the date on the draft termination letter and send it to Dr. Patterson for his signature.  Dr. Patterson writes in his declaration, "Because Dr. Faber's disruption was spilling into the community, I felt his employment with MSPG had to end."  *Id*. at Ex. 9, Patterson Decl. ¶ 8, ECF No. 22-9.

The decision to terminate Dr. Faber's employment was made by Dr. Patterson in consultation with Branham and Steph Dominy.  Dr. Patterson discussed the decision with Jeter because the liquidated damages payment of $20,000 was paid out of Jeter's budget as CEO of JMH.  Prior to Dr. Faber's termination, Jeter told Dr. Patterson that he did not want Dr. Faber to continue to work at JMH and that he would need to be transferred to a different facility if MSPG continued to employ him.  The termination letter given to Dr. Faber was printed on Ballad letterhead.  The header of the stationary reads "Ballad Health Medical Associates," and in the signature line, Dr. Patterson is identified as "President."  Resp. Opp'n Ex. 1, ECF No. 25-1.

Dr. Patterson declares:

> When I learned that Dr. Faber had made allegations of Medicare fraud, I took those allegations seriously.  We had Ballad Health's Compliance Department initiate an investigation into the claims.  Compliance did a thorough evaluation and found no evidence of Medicare fraud.  Dr. Faber's concerns were baseless, and were not a factor in his termination.

Patterson Decl. ¶ 9, ECF No. 22-9.

On January 11, 2020, at around 7:00 a.m., Branham gave Dr. Faber the termination letter in the hospitalist conference room.  The letter specified that he was being terminated pursuant to Section 5.3 of the Employment Agreement.  MSPG paid Dr. Faber more than $20,000, representing liquidated damages under the Employment Agreement plus accrued, unpaid compensation.  Dr. Faber retained the funds.

About 15 hours after receiving notice of his termination, Dr. Faber sent an email to the U.S. Department of Health and Human Services Office of Inspector General complaining of wrongful termination for failure to commit Medicare fraud in admission practices.  He received no response.  He had not previously contacted any government entity regarding alleged Medicare fraud.

Dr. Faber testified in his deposition that he does not contend that any patients were actually admitted to JMH when they did not meet Medicare admission requirements.  He further does not allege that JMH submitted any false claims for Medicare or Medicaid reimbursement.  His only claims are for alleged retaliatory discharge.

Dr. Faber testified that Drs. Odeti and Dye encouraged him to collect patient records from cases where he felt he was pushed to admit patients inappropriately.  He testified that Drs. Odeti and Dye promised him they would meet monthly to

discuss his concerns, but they did not follow through on that promise.  Dr. Faber made a list of these patients, and many of them turned out to be Medicare enrollees. Dr. Dye and another witness, Dr. Dawson, disputed Dr. Faber's assessment of medical necessity as to two of these patients, but the defendants have offered no evidence contradicting the reasonableness of Dr. Faber's assessments as to the remaining cases he identified.  Upon investigation, Ballad personnel agreed with Dr. Faber's assessment that several of the identified patient cases did not meet admission criteria.  Dr. Faber testified that physicians had been instructed to raise issues such as these through the chain of command, which is why he complained to Drs. Odeti, Dye, and Peters, and to Branham.

After his termination, Ballad's Chief Compliance Officer led an investigation that reviewed 191 admissions of Medicare patients at JMH.  The investigation concluded that "[t]here was nothing in the review to indicate a pattern of inappropriate admissions."  Kindle Decl. Ex. N. at 3, ECF No. 22-2.  Dr. Faber asserts, however, that his "fundamental claim is about the admissions he prevented. No one from Ballad or MSPG has ever reviewed with Dr. Faber the list he compiled of what he still believes were pushed admissions."  Resp. Opp'n 21, ECF No. 25.

On these facts, the defendants have moved for summary judgment.  The motion has been briefed and orally argued and is ripe for decision.

II.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its existence or non-existence could result in a different jury verdict. *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). When ruling on a summary judgment motion, the court should consider the parties' pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *Celotex Corp. v. Catrett ex rel. Catrett*, 477 U.S. 317, 322 (1986). "[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (unpublished) (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles Alan Wright &

Arthur R. Miller, *Federal Practice and Procedure* § 2728 (3d ed. 1998)).  The court may not assess credibility on a motion for summary judgment.  *Id.* at 569.

Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis.  *Celotex Corp.*, 477 U.S. at 327.  It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

III.

A.

Ballad contends that it is entitled to summary judgment because it is not a proper defendant.  The only retaliatory act Dr. Faber alleges is his termination, and Ballad did not terminate Dr. Faber, as it was not his employer.

Dr. Faber responds that the anti-retaliation provision of the False Claims Act ("FCA"), as revised in 2009, contemplates claims by contractors as well as employees.  He argues that he was a contractor of Ballad and can thus bring a retaliation claim against Ballad.

Dr. Faber is correct that the statute covers contractors.  31 U.S.C. § 3730(h)(1).  The problem is that the record contains no evidence that he was a party to any contract with Ballad.  He was employed by MSPG.  MSPG presumably had a contract with JMH, although that contract is not in the record.  JMH is

majority-owned by MSHA, and MSHA's parent company is Ballad.  Ballad is thus a parent company of Dr. Faber's employer, several times removed.

Dr. Faber points to case law indicating that physicians with admitting privileges in hospitals could be considered contractors of those hospitals.  *El-Khalil v. Oakwood Healthcare, Inc.*, Case No. 19-12822, 2020 WL 1915358, at *2 (E.D. Mich. Apr. 20, 2020).  Setting aside the factual differences between the contractual relationships in that case as compared to this one, the simple truth is that Dr. Faber did not sue a hospital.  He sued the ultimate parent company of a hospital.  He has shown no basis for piercing the corporate veil, nor has he even argued that theory of liability.  There is simply no ground on which Ballad could be held liable for Dr. Faber's FCA retaliation claim.  I will therefore grant the Motion for Summary Judgment as to Ballad.

## B.

The defendants argue that Dr. Faber has not met his burden with respect to the elements of his FCA retaliation claim.   At the summary judgment phase, "[r]etaliation claims can be proven by either the submission of direct evidence of retaliatory animus or by use of the *McDonnell Douglas* burden-shifting framework." *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 176 (4th Cir. 2018) (unpublished) (applying this framework to an FCA retaliation claim).  Dr. Faber does not purport to have direct evidence of discrimination, so the parties

proceed under the burden-shifting analysis.  "Under the burden-shifting framework, a plaintiff must first offer a prima facie case." *Sempowich v. Tactile Sys. Tech., Inc.*, No. 20-2245, 2021 WL 5750450, at *3 (4th Cir. Dec. 3, 2021).  "Assuming the plaintiff establishes a prima facie case of retaliation under the FCA, a presumption of retaliation arises, and the burden then shifts to the employer to show that it had a legitimate non-retaliatory basis for its actions." *ManTech Int'l Corp.*, 746 F. App'x at 177.  "If the employer makes this showing, the presumption vanishes and the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination."  *Id.* (internal quotation marks and citation omitted).

The anti-retaliation provision of the FCA provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).  Dr. Faber's FCA claim relies on the final clause of this paragraph; he contends he was discharged because he undertook "other efforts to stop 1 or more violations of" the FCA.  *Id.*

-17-

A person violates the FCA when he "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). "The FCA reaches claims submitted by health-care providers to Medicare and Medicaid — indeed, one of its primary uses has been to combat fraud in the health-care field." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 467 (6th Cir. 2011). "[C]laims for medically unnecessary treatment are actionable under the FCA." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004); *see also Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1113 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1380 (2021). Medicare will only pay for inpatient hospital services if "a physician certifies that such services are required to be given on an inpatient basis for such individual's medical treatment, or that inpatient diagnostic study is medically required and such services are necessary for such purpose." 42 U.S.C. § 1395f(a)(3).

To establish a prima facie case of unlawful retaliation under the FCA, a plaintiff must prove that "(1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him as a result." *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 200 (4th Cir. 2018). Here, the defendants contend that Dr. Faber has not adduced evidence showing any of these three elements.

The Fourth Circuit has held that "an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Id.* at 201.

> A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA. However, while the plaintiff's actions need not lead to a viable FCA action . . . they must still have a nexus to an FCA violation.

*Id.* at 201–02 (internal quotation marks omitted). "[T]he FCA requires a statement known to be false, which means a lie is actionable but not an error." *Riley*, 355 F.3d at 376. "Defendants act with the required scienter if they know the treatment was not medically necessary, or act in deliberate ignorance or reckless disregard of whether the treatment was medically necessary." *Winter*, 953 F.3d at 1114.

As for the causation prong, while the Fourth Circuit has not decided in any published opinion whether an FCA retaliation claim requires "but-for" causation, a panel of the court has so held in an unpublished decision. *ManTech Int'l Corp.*, 746 F. App'x at 177.

I will assume without deciding that Dr. Faber has produced evidence sufficient to establish a prima facie case of retaliation under the FCA. *See Mandengue v. ADT Sec. Sys., Inc.*, No. ELH-09-3103, 2012 WL 892621, at *16 (D. Md. Mar. 14, 2012) (noting that "it is a common practice of the Fourth Circuit to assume, without deciding, that the plaintiff has established a prima facie case in cases

where the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment"). The defendants have proffered ample evidence of legitimate, nondiscriminatory reasons for his termination. Dr. Faber has failed to dispute most of the facts underlying those reasons, and he has not pointed to any substantial evidence from which a reasonable jury could conclude that the defendants' stated reasons were pretext and that the real reason for his termination was unlawful retaliation. Dr. Faber's claim thus fails at the final pretext stage of the *McDonnell Douglas* analysis.

In assessing whether a plaintiff has shown pretext, "ultimately, it is the perception of the decisionmaker which is relevant." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (internal quotation marks, alterations and citation omitted). "[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, . . . so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (internal quotation marks and citation omitted). To demonstrate pretext, "the plaintiff must 'show that the employer's proffered explanation is unworthy of credence, thus supporting an inference of discrimination, or offer other forms of circumstantial evidence sufficiently probative of intentional discrimination.'" *Smith v. Premier Prop. Mgmt.*, 793 F. App'x 176, 178 (4th Cir. 2019) (quoting *Dugan v. Albemarle*

*Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002)).  "[J]udgment as a matter of law may be appropriate if a plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Holland*, 487 F.3d at 215 (internal quotation marks and citation omitted).

Dr. Faber was the only witness deposed in this case.  He relies primarily on his own testimony and various email exchanges.  His theory of pretext is essentially that he was terminated the day after he sent the email to his church listserv, in which he referenced being pressured to commit fraud in admissions.  The day before, he had emailed his supervisor complaining that Dr. Peters had told him not to question admission recommendations, which he believed was a direction to admit patients when admission was not medically necessary.  In Dr. Faber's view, the fact that he was terminated immediately after the email to his church listserv, and just days after complaining to his supervisor about Dr. Peters' directive, demonstrates that the defendants' stated reasons are pretextual.  This is so, he says, because he had not been terminated immediately following prior incidents that the defendants now reference.

In the context of this case, "[t]his temporal proximity . . . is simply too slender a reed on which to rest" his retaliation claim, particularly given that the email to the church listserv provided MSPG with other legitimate, nondiscriminatory reasons to

discharge Dr. Faber. *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993) (finding no evidence of pretext to support claim of retaliatory discharge under 42 U.S.C. § 1983).

Dr. Faber also contends that MSPG's decision to terminate him under the "without cause" provision of the Employment Agreement shows that the reasons it now states for his termination are mere pretext. The implication is that if MSPG had terminated him for lawful reasons, it would have told him those reasons at the time of his termination. But as MSPG has explained, the fact that chose to terminate him under the "without cause" provision of his contract does not mean that there was in fact no cause for his termination. MSPG did not tell Dr. Faber that it had no cause to fire him, nor did MSPG tell him it was terminating him for a reason inconsistent with those set forth in this litigation. There may have been legitimate reasons for MSPG to invoke the "without cause" contractual provision — most obviously, so that it could pay him liquidated damages and avoid a protracted, costly dispute about the reasons for his termination.

Dr. Faber's purported evidence of pretext simply is not strong enough to meet his burden. "[T]he plaintiff cannot seek to expose [the employer's] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be 'material.'" *Holland*, 487 F.3d at 216 (internal quotation marks and citation omitted). For his

claim to succeed, Dr. Faber must show that he would not have been terminated had he not raised concerns about suspected or attempted Medicare fraud. He cannot make that showing when the record is replete with undisputed evidence that he was persistently difficult to work with and that his behavior caused staffing and patient flow problems in the hospital. The defendants are therefore entitled to summary judgment on the FCA retaliation claim.

## C.

The defendants also contend that Dr. Faber cannot prove the elements of his state law claim. Generally, employment in Virginia is at will, but the Supreme Court of Virginia, in *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985), created "an exception to the employment-at-will doctrine limited to discharges which violate public policy, that is, the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915, 918 (Va. 1987). This exception only applies in narrow circumstances, and "[a]s a threshold matter, a plaintiff attempting to assert a wrongful discharge claim pursuant to *Bowman* must identify a Virginia statute that the employer-defendant violated by terminating the plaintiff." *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 450 (E.D. Va. 2002); *see also McCarthy v. Tex. Instruments, Inc.*, 999 F. Supp. 823, 829 (E.D. Va. 1998) ("A *Bowman* claim must find root in a state statute.").

The state statute under which Dr. Faber asserts a claim reads:

> No hospital may retaliate or discriminate in any manner against any person who (i) in good faith complains or provides information to, or otherwise cooperates with, the Department or any other agency of government or any person or entity operating under contract with an agency of government having responsibility for protecting the rights of patients of hospitals, or (ii) attempts to assert any right protected by state or federal law.

Va. Code Ann. § 32.1-5.4 (2018).  Here, Dr. Faber relies on clause (ii) and the right set forth in 31 U.S.C. § 3730(h)(1) and Va. Code § 8.01-216.8 (2015).  As used in section 32.1-5.4, "hospital" means

> any facility licensed pursuant to this article in which the primary function is the provision of diagnosis, of treatment, and of medical and nursing services, surgical or nonsurgical, for two or more nonrelated individuals, including hospitals known by varying nomenclature or designation such as children's hospitals, sanatoriums, sanitariums and general, acute, rehabilitation, chronic disease, short-term, long-term, outpatient surgical, and inpatient or outpatient maternity hospitals.

Va. Code Ann. § 32.1-123 (2018).

What dooms this claim is the fact that Dr. Faber has not sued a hospital.  He has sued his employer, MSPG, and the ultimate parent company of a hospital, Ballad.  The statute plainly applies only to hospitals.  Because the defendants are not hospitals, the defendants are entitled to summary judgment on Count Two.

III.

For the foregoing reasons, it is **ORDERED** that the Motion for Summary Judgment, ECF No. 20, is GRANTED.   A separate judgment will be entered herewith.

ENTER:   December 27, 2021

/s/  JAMES P. JONES
Senior United States District Judge